**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

DAVID HAWKINS,                          )
                                        )
              Plaintiff,          )
vs.                                     )          NO.  CIV-12-0084-HE
                                        )
SCHWAN'S HOME SERVICE, INC.,            )
                                        )
              Defendant.          )

## <u>ORDER</u>

Plaintiff David Hawkins filed this action against his former employer, Schwan's Home Service, Inc. ("Schwan's"), asserting claims for disability discrimination and retaliation in violation of the Americans with Disabilities Act as amended ("ADAAA") and the Oklahoma Anti-Discrimination Act ("OADA").  He also asserts a <u>Burk</u> tort.  Both parties have filed motions for summary judgment, which is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A genuine dispute as to a material fact 'exists when the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'"  <u>Carter v. Pathfinder Energy Services, Inc.</u>, 662 F.3d 1134, 1141 (10th Cir. 2011) (quoting <u>Zwygart v. Bd. of Cnty. Comm'rs</u>, 483 F.3d 1086, 1090 (10th Cir.2007)).  Having considered the submissions of the parties in light of this standard, the court concludes defendant's motion should be granted.[1]

_____

[1]_In granting Schwan's motion, the court has viewed the evidence and any reasonable inferences from it in the light most favorable to plaintiff._ <u>_Swackhammer v. Sprint/United Mgmt. Co.,_</u>

<u>Background</u>

Plaintiff has been employed since 1987 by Schwan's, a company which sells and delivers frozen food products to residential customers. In 2003, plaintiff became a Facility Supervisor at Schwan's Alva, Oklahoma sales and distribution depot. Jim Hillaker, the Territory Sales Leader at the Alva depot supervised plaintiff in 2009 and 2010.

Plaintiff's job consisted principally of "'supervising the depot material handler and coordinat[ing] the products receiving and material handling activities necessary to fill the sale activities as assigned to [the] depot.'" Doc. #70-A, depo. p. 182 (quoting depo. Exhibit 11).[2] He was required to have a valid Department of Transportation Medical Examination Certification ("MEC") to enable him to operate Schwan's trucks, which were Department of Transportation ("DOT") regulated vehicles. Although the parties disagree about whether operating a commercial vehicle was an essential function of the Facility Manager Position, it is undisputed that any individual who operates a Schwan's truck, which is a DOT regulated vehicle, must have a valid MEC. Plaintiff also admitted that the qualifications section of the job description for Facility Supervisor (DOT) "requires passing a medical certification to drive a commercial vehicle," Doc. #83, p. 7, ¶6,[3] and that all Schwan's Facility Supervisors

---

*493 F.3d 1160, 1167 (10th Cir. 2007).*

[2]*Exhibits will be identified by Document number and Exhibit number or letter. Some exhibits are deposition exhibits that are attached to other exhibits. They will be identified by Document number, the Exhibit letter or number and then the deposition exhibit number. For example, Document #70, Defendant's Exhibit A, depo. Exhibit 11 will be identified as Doc. #70-A-11.*

[3]*Page references for briefs are to the CM/ECF page number.*

are required to be DOT medically qualified.  Doc. #83, p. 11, ¶22.

Plaintiff had heart problems, which necessiated a pacemaker and his taking various prescription medications.  Starting in March, 2010, he was "in and out of the hospital ... with heart problems and fainting spells and very high blood pressure."  Doc. #70-M.  In June 2010, he had a stroke, but returned to work.  Sometime during this period plaintiff told Jonathan Talley, a coworker, that he had fainting spells and mentioned that he had fainted while driving home from work one evening.  Plaintiff told Hillaker that he had instructed other employees in the depot to put a pill under his tongue if they found him passed out at work.

On June 14, 2010, plaintiff sent an email to Jeff Booth, Schwan's Human Resources manager, stating concerns he had with Hillaker, including that Hillaker was having him drive Schwan's route trucks to a mechanic in Enid and also back and forth to Woodward.  Plaintiff was concerned that he could not safely drive the trucks.  Plaintiff testified that Hillaker only made him drive after he returned from being in the hospital and that, during that period, Hillaker made statements to the effect that he wanted to get rid of plaintiff.   He claims Hillaker began requiring him to drive to force him out of the company and that "[a]s an indication that this was harassment rather than a legitimate job duty, Hillaker ordered Plaintiff to drive trucks which were legally prohibited from being on the road,"  Doc. #83, p. 12, ¶33-34, and ordered him to drive after he expressed concern about plaintiff fainting or blacking out.  Plaintiff contends that driving trucks to the mechanic was the responsibility of drivers and their supervisor, Hillaker.

3

Although a mechanic had previously driven to Alva to work on Schwan's trucks, plaintiff testified that the mechanic did not get along with Hillaker, so a different mechanic, who was in Enid, was hired to do the work. Plaintiff did not know if the Enid mechanic, who was a friend of Hillaker's, was hired because of his relationship with Hillaker or if it was "part of the deal to force [plaintiff] out of the door." Doc. #83- 7, depo. p. 302. After plaintiff left Schwan's, he claims they "got a mechanic coming back and forth to Alva and working on trucks again." *Id*. at p. 151. Talley, apparently the only material handler at the Alva Depot, whom plaintiff supervised from 2006 until he left the company in 2010, testified that plaintiff had to drive to Woodward "because [Schwan's] had changed route guys and half of them were staying over in Woodward . . . ." Doc. #70-H, depo. p. 16. Talley stated that he could not drive the trucks until he became DOT-qualified in February 2012.

The prior material handler at the depot, Truman Cookson,[4] was DOT qualified. He testified that he "drove the Schwan's trucks between Alva and Enid to shuttle product and trucks" and plaintiff "did not need to drive them for that purpose at the time, because [he] was DOT qualified and ... could do it. Doc. #70-E. He also stated that they "had to drive the trucks off the lot for repairs." *Id*. Plaintiff disagreed with Cookson's testimony, stating that "[m]ost of the time the mechanics came to the facility to repair the trucks and if this were not possible, the drivers would take the trucks to the mechanic." Doc. #84-4.

Matthew Valade, the Facility Supervisor at the Alva depot from August 2011 until

---

[4]*Cookson stated that he as best he could recall, he worked for Schwan's in 2005 and 2006. Talley was hired in 2006. Doc. #83-19.*

October 2011, testified that he had to be DOT-qualified to be a Schwan's Facility Supervisor and was told during his interview by Hillaker that he might have to drive a Schwan's route truck as part of his job. He stated that while he held that position he drove DOT-regulated trucks on an average of every three days, taking them to and from repair shops for engine and tire work. Once he also had to drive a route truck back from Oklahoma City. Doc. #84-13.

Plaintiff acknowledged that in some depots the facility manager has to drive and in others he or she did not. Doc. #83-7, depo. p. 307. Plaintiff stated it was not required in Alva because "Alva's small and everything was close." *Id.* In 2007 plaintiff drove Schwan's trucks for six months when "they shut Alva down for a period of time and they had [plaintiff] drive Schwan's trucks from Alva to Enid to load and drive the truck back from Enid to Alva, and then do the same in Woodward, then do the same in Laverne . . . ." *Id.* at p. 154.

Plaintiff was examined by a physician on June 21, 2010, for a DOT medical evaluation. Although he had received MEC's in prior years, he did not pass the exam because of his health history, including his visit the preceding weekend to the emergency room with a blood-pressure induced mini stroke. The parties stipulate that plaintiff's medical conditions would prevent him from passing the DOT medical certification. On June 22, 2010, Schwan's gave plaintiff a letter placing him "on a 30 day company requested unpaid leave, effective June 21, 2010, because [he] did not pass [his] DOT recertification." Doc. #70-A-47. Plaintiff was given "30 days to find a non-DOT position or obtain the DOT certification card." *Id.*

Sometime around June 22, 2010, plaintiff spoke with a Schwan's Leave of Absence

Administrator, who told plaintiff that Schwan's was placing him on a thirty day company requested leave because the doctor did not give him a MEC. She informed him that he could apply for other non-DOT positions on Schwan's public website.[5] Plaintiff looked at the website but did not apply for any jobs. While the company had open non-DOT positions in Oklahoma during the 30 day period, they paid much less, were too far away from his home or he was not qualified for the positions. Plaintiff signed a termination form on June 23, 2010. Although the form stated that he "voluntarily resign[ed]," plaintiff listed as the reason for his action that he was "Force to quit for medical reason." Doc. #70-A-48. Plaintiff applied for Social Security Disability Insurance on April 6, 2010. As of December 2012, his application, though denied at various levels of the process, was still on appeal.

Discussion

ADAAA claims

"The burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) generally applies to ADA disparate treatment claims." Davidson v. Am. Online, Inc., 337 F.3d 1179, 1189 (10th Cir. 2003). Under that framework, the plaintiff must first make out a prima facie case of discrimination. Id. Once the plaintiff does so, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. Id. If the defendant carries this burden, the plaintiff must then produce evidence that the defendant's justification is pretextual. Id.

---

[5]The parties dispute as to what else she told plaintiff.

ADAAA – discrimination

Plaintiff claims defendant discriminated against him by terminating him because he was disabled.[6] To recover under the ADAAA plaintiff must first demonstrate[7] that (1) he is a disabled person as defined by the ADAAA; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) his employer discriminated against him because of his disability. *Id*. at 1188.

The term "disability" means "a physical or mental impairment that substantially limits one or more major life activities" of an individual." 42 U.S.C. § 12102(1)(A). Major life activities include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* at §12102(2)(B).[8] "The determination of whether an impairment substantially limits a major life activity [is] made without regard to the ameliorative effects of mitigating measures such as--(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices,

---

[6]*While defendant discusses whether it regarded plaintiff as being disabled, because the court has assumed plaintiff is disabled for purposes of establishing his prima facie case, it will not address that issue.*

[7]*The plaintiff must offer evidence sufficient to create a genuine issue of material fact as to each element of his prima facie case.* Davidson, *337 F.3d at 1189.*

[8]*The accompanying regulations define physical impairment to mean a "physiological disorder or condition ... affecting one or more body systems, such as ... cardiovascular" and major life activities to include circulatory and cardiovascular functions. 29 C.F.R. § 1630.2(h)(1).*

hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies." *Id.* at § 12102(4)(E)(i).

While defendant asserts plaintiff is not disabled, it relies, as plaintiff notes, on pre-ADAAA standards. Under these circumstances and in light of the much broadened definition of disability and the evidence plaintiff submitted, see Doc. #71-1, depo. pp. 15-28, the court concludes plaintiff has met his burden of establishing the first element of his prima facie case. *See* 42 U.S.C. § 12102(4)(A).

Having concluded for purposes of defendant's motion that plaintiff has shown he was disabled and, because defendant essentially admits that plaintiff's heart condition or "disability" "played a prominent part" in its decision to place him on unpaid leave, "[t]he McDonnell Douglas burden shifting approach is unnecessary because the issue of the employer's intent has been admitted and the plaintiff has direct evidence of discrimination on the basis of his disability." Davidson, 337 F.3d at 1189. In this circumstance, "the employer will defend its decision on the ground that the plaintiff is not otherwise qualified for the position, with or without reasonable accommodation." *Id.* Here, as in Davidson, "the key to [the court's] decision is whether [Hawkins] is a 'qualified individual' as defined by the ADA[AA]." *Id.*

Two criteria are considered when determining whether a plaintiff is a "qualified individual" for purposes of the statute. *Id.* at 1190. First the court assesses whether the plaintiff's impairment prevented him from "performing the essential functions of the job." *Id.* If it did, the court must determine whether the plaintiff might have been able to perform

those functions if his employer had provided him with a reasonable accommodation. *Id.*

The initial question is whether the employer "actually requires all employees in the particular position to satisfy the alleged job-related requirement." *Id.* As it is undisputed here that Schwan's required all facility managers to be DOT qualified, the court must determine whether the challenged tasks were "essential" or fundamental to the job.

"Essential functions" are defined as "the fundamental job duties of the employment position the individual with a disability holds or desires," but not "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be essential "because the reason the position exists is to perform that function" or "because of the limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. § 1630.2(n)(2). When determining whether a particular function is essential, the court "must give consideration to the employer's judgment as to what functions of a job are essential, including those functions contained in a written job description." Davidson, 337 F.3d at 1191; *see* Hennagir v. Utah Dep't of Corr., 587 F.3d 1255, 1262 (10th Cir. 2009) ("We weigh heavily the employer's judgment regarding whether a job function is essential."). "However, such evidence is not conclusive; an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." Davidson, 337 F.3d at 1191 (internal quotations omitted). Factors considered in the inquiry include: "[t]he employer's judgment as to which functions are essential;" "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job;" "[t]he amount of time spent on the job performing the

9

function;" "[t]he consequences of not requiring the incumbent to perform the function," and "[t]he current work experience of incumbents in similar jobs." *Id.* at §1630.2(n)(3); *see* 42 U.S.C. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.").

The written description of plaintiff's position, "Facility Supervisor I (DOT)," states that the job's basic function is to "supervis[e] the depot material handlers and coordinat[e] the product receiving and material handling activities necessary to fulfill the sales activities at [the] assigned depot[]." Doc. #70-A-11. Listed duties include fleet management responsibilities, which include "communicating with truck maintenance provider, vehicle registration and license, and periodic fleet safety inspections" and coordinat[ing the receiving of product with Demand Replenishment Planning (DRP) and Dispatch." *Id*. One of the four listed job qualifications is: "Must meet the Federal Department of Transportation eligibility requirements, including appropriate driver's license and corresponding medical certification as a condition of employment for this position." *Id.*

While plaintiff does not dispute that the position description specified that facility managers had to be DOT medically qualified, he argues that the identified duties of managing the fleet and coordinating the receipt and dispatch of product "facially do not require driving a commercial vehicle." Doc. #83, p. 11. However, having the ability to drive one of Schwan's trucks when the need arose is consistent with the specified duties, when

they are considered in the context of the type of business and how it operated.

Plaintiff also asserts that driving is not included as one of the job's "essential abilities and functions." #70-A-11.  However, the listed functions consist almost entirely of physical activities, such as walking, sitting, or stooping, or mental functions, such as reasoning, solving problems, reading, writing, or performing mathematical calculations.  *Id.*  Its absence from the list of working conditions is not notable.

Plaintiff argues that "[w]hen driving is a required duty, it is listed on the job description," Doc. #83, p. 11, citing job descriptions for Lead Production I and Lead Warehouse DCI.  Both of those position descriptions specify, under duties and responsibilities, that the job holder "[d]rives  and holds accountability for the attainment . . . ."  Doc. #83-12; *see* Doc #83-13.  As defendant explains, the term drive, as used in that context, is synonymous with motivates.  Neither of those position descriptions has either "(DOT)" after the job title or the requirement under qualifications, that the job holder must meet the federal DOT eligibility requirements.

Citing Talley as an example, plaintiff next contends that Schwan's required employees who did not drive to meet DOT requirements.  Talley did not, though, hold the same position as plaintiff and two positions can share a job requirement, which may be an "essential function" for one position, but not the other.  Plaintiff admitted during his deposition that, although Talley had expressed an interest in being a facility supervisor, he could not get that job because he was not able to get the required DOT certification.  Doc. #70-A, depo. pp. 181-82.

It is clear that Schwan's considered being DOT qualified to operate a Schwan's route truck an essential job function and that the written job description identified it as one of the job qualifications. The court must therefore look at other factors – whether being DOT qualified can be considered an "essential function" of the job, when plaintiff did not have to do it regularly, and the impact on the defendant's business if the Alva facility supervisor was not required to perform the function. *See* <u>Davidson</u>, 337 F.3d at 1189 (The inquiry "center[s] around whether removing the function would fundamentally alter the position.") (internal quotations omitted).

Defendant asserts that its facility supervisors must be authorized to operate DOT regulated vehicles so they could pick up and deliver vehicles for service and repair and facilitate the fueling and the loading and unloading of goods from the vehicles. While a facility supervisor might not have to operate a commercial vehicle on a daily basis, Schwan's claims it was essential that he be able, as supervisor, to assume the task of his supervised employees, when needed to prevent the disruption of its business. Schwan's offered evidence of different situations where the facility supervisor would need to drive a Schwan truck -- DOT hours of service rules sometimes made it difficult or impossible for a Schwan's route sales representative to return to Alva to restock his truck and, while some mechanics would pick up a truck that need repair at the depot, others would not. Hillaker testified that if plaintiff could not drive, he would have to do it as there was no other person with DOT

qualifications available.[9]

Plaintiff responds that, while it might have been convenient to have him drive one of the commercial trucks, it was not routinely done and was not an essential activity because there were back up drivers who could be borrowed from other facilities and the Territory Sales Leader (Hillaker's position) could fill in. He contends that trucks did not have to be driven to the mechanic for repairs as Schwan's contracted with mechanics who would travel to the facility or tow the truck to the repair locations. He produced evidence that, when driving was required, either the sales manager or drivers took trucks to be repaired and that needed supplies were transported to the drivers by noncommercial vehicles, rather than by truck.

In the particular circumstances present here, the court concludes that being able to operate one of Schwan's trucks was an essential function of plaintiff's position. Plaintiff's job was to keep the trucks loaded and on the road. Accepting the evidence in the light most favorable to plaintiff, most of the time he was able to perform his job without having to drive one of the DOT regulated vehicles. On the occasions when he might need to drive, another driver might be found, as plaintiff suggests. However, Schwan's made the business decision to handle extra or unexpected driving needs by requiring its two supervisors at each depot – the Territory Sales Leader and Facility Supervisors – to be DOT qualified drivers. What

---

[9]*Plaintiff asserts that there was a stand-by driver because there were seven drivers, but only six routes, but offers no evidence that the extra person was on site and available to drive when needed.*

distinguishes this case from many others is that Schwan's could not always anticipate when an authorized driver might be required. Having someone on site who could drive eliminated the need to find someone else who could fill in at the last minute. It also allowed the company to hire mechanics who might not work in Alva or be willing to drive to the depot and to accommodate driver or route changes.[10]  It was not only "convenient" for the company, but an efficient use of the small number of employees it had at its Alva depot. The consequence of not requiring the Facility Supervisor to be DOT qualified might not be life-threatening or dire, *see e.g.*, Hennagir, 587 F.3d at 1258-59, but could obviously disrupt the operation of the depot.

If plaintiff had never had to drive a truck, the court might view the case differently. However, is undisputed that plaintiff did drive Schwan's trucks regularly for a period of time in 2007 and that the material handler before Talley was able to do any driving required, eliminating any need for plaintiff to do so.  That combined with the fact that all Schwan facility supervisors were required to be DOT qualified, that the written job description for plaintiff's position required Dot certification, that, excepting the route salesman, there were only one other person at the Alva depot besides plaintiff who was authorized to drive a Schwan's truck, and that, if the restriction were removed, Schwan's business could be disrupted is sufficient, the court concludes, to demonstrate that being DOT qualified was "a

_____

[10]*Other than his suspicions as to Hillaker's motivations, the only evidence plaintiff had that it was unnecessary to drive the trucks to Enid for repairs was that after "they forced me to quit, they got a mechanic coming back and forth to Alva and working on the trucks again." Doc. #83-7, depo. p. 151.*

necessary requisite to [plaintiff's] employment." Davidson, 337 F.3d at 1191 (internal

quotation omitted); *see generally* E.E.O.C. v. Picture People, Inc., 684 F.3d 981, 987 (10th

Cir. 2012) ("When only one other staff member is present, it simply is not feasible to

delegate all of these duties."). As the Tenth Circuit has noted, the essential function inquiry

"is not intended to second guess the employer or to lower company standards." *Id.* "

Most of the cases cited by the parties were too distinct factually to provide much

guidance. While defendant relies heavily on Knutson v. Schwan's Home Serv., Inc., 711 F.3d

911 (8th Cir. 2013), the court finds it to be distinguishable. In Knutson the Eighth Circuit

concluded that being DOT qualified to drive a delivery truck was an essential function of the

position of Location General Manager,[11] the job Hillaker held at the Alva depot. The court

made that determination, despite the plaintiff's testimony that "he managed his depot

successfully without driving a delivery truck." *Id*. at 915. It disregarded the manager's

personal experience, concluding that it was "the written job description, the employer's

judgment, and the experience and expectations of all [Managers] generally [that] establish

the essential functions of the job." *Id*. Schwan's offered evidence in that case that managers

drove delivery trucks to deliver product and train new employees and that if they did not the

company sales would suffer and it would have to restructure its training process. Unlike

Knutson, the parties here take the position that Hawkins' personal experience is relevant to

the essential function determination. In the absence of cited authority to the contrary or

---

[11]*Schwan's previously referred to its facility supervisors as facility managers and its territory sales managers as location general managers.*

evidence pertaining to Schwan facility supervisors generally,[12] the court has limited its focus to the Alva Depot.

Having determined that the "job specification [was] job-related, uniformly enforced, and consistent with business necessity," <u>Davidson</u>, 337 F.3d at 1191, the court concludes Schwan's had the right to require its facilty supervisors to be DOT qualified. *See* <u>Hennagir</u>, 587 F.3d at 1262 ("We weigh heavily the employer's judgment regarding whether a job function is essential."); *see* <u>Picture People</u>, 684 F.3d at 991 ("A court should be hesitant in displacing the business judgment of an employer on how to run its business."). As the parties stipulated that plaintiff would be unable to pass the DOT medical certification and, thus, "is unable to perform an essential function, the next inquiry is whether [he] could perform this job with reasonable accommodations." <u>Picture People</u>, 684 at 987.

While defendant disputes whether plaintiff ever asked to be accommodated, it contends that the accommodation requested[13] – to not be required to drive a company vehicle -- is unreasonable because that was an essential job function. The court agrees. "It is axiomatic . . . that an employer is not required to relieve an employee of an essential job function." *Id;* <u>Davidson</u>, 337 F.3d at 1192 ("We note that should a jury decide that voicephone experience is an essential function, the inquiry ends there, because the reasonable accommodation requested by Davidson is to eliminate that essential function, which an

---

[12]*The only evidence pertaining to other depots consisted of plaintiff's testimony that in some depots the facility supervisor had to drive and in others he or she did not.*

[13]*The accommodation plaintiff sought was to keep his job and not have to drive. See Doc. #83, pp. 31-32.*

employer is not required to do."). Because plaintiff could not perform an essential function of his job and he did not demonstrate the existence of a facially reasonable accommodation, he was not a "qualified individual" for purposes of the ADAAA.

Even if the court were to conclude that being DOT qualified was not an essential function of the Facility Supervisor position, plaintiff's ADAAA discrimination claim would nonetheless fail on the basis of estoppel or related doctrines. After his employment with Schwan's ended, plaintiff applied for social security disability benefits. He has not been awarded benefits, and his appeal apparently is still pending.[14]

The Supreme Court has held that a plaintiff's application for benefits, alone, does not preclude him from arguing that he is a "qualified individual with a disability" as defined by the ADAAA. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999). "[I]f an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system." Id. at 805. If, however, a court is faced with a conflict between a claim under the ADA and an application for disability benefits that involves a legal conclusion, such as "a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA

---

[14]*Plaintiff has offered no information regarding the status of his benefits claim in his brief. All he states is that he was not awarded benefits. Defendant asserts that plaintiff testified during his December 5, 2012, deposition, that his claim for Social Security disability benefits was still pending on appeal. See Doc. # 90-2, depo. p. 143.*

claim." *Id.* at 807.[15]

In his benefit application, signed on April 6, 2010, plaintiff stated that he could not "work right now" and that he has "not been able to work for 5 weeks." Doc. #90-4. Those statements by themselves, even if not explained, probably would not be sufficient to bar plaintiff's ADAAA claim.[16] However, some explanation is required when those remarks are combined with the statements plaintiff subsequently made in conjunction with his Social Security appeal.

In a December 21, 2011, submission to the Appeals Council of the Social Security Administration, plaintiff's brief states that "the record will show that Mr. Hawkins would have difficulty with sustained work." Doc. #84-10. It asserts that plaintiff presented for a DOT physical on June 21, 2010, was not able to qualify for a commercial driver's license, and "could not return to his job due to his limitations and inability to obtain a CDL." *Id.* Plaintiff further asserts that "[t]he exhibits and testimony clearly reveal that Mr. Hawkins was incapable of performing all duties necessary for any type of substantial gainful activity, nor was he able to work on a sustained or daily basis as he did not have the physical or

---

[15]*In* <u>Cleveland</u> *the Supreme Court noted that when the conflict "for the most part involve[s] purely factual contradictions," id., "[t]he lower courts . . . have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Id. at 806, citing* <u>Franks v. Nimmo</u>*, 796 F.2d 1230, 1237 (10th Cir. 1986). That issue was not, though, before the Supreme Court, which "[did] not necessarily endorse [those] cases, but "[left] the law as [it] found it." Id. at 807.*

[16]*The part of the benefit application in the record does not reflect that the statements were under oath, but the court assumes they were.*

18

mental residual functional capacity. . . . The claimant's ability to work is less than sedentary."[17]  *Id.*

Rather than explain the inconsistent statements, plaintiff essentially asserts that they do not matter because "the Plaintiff was not awarded SSDI benefits."  Doc. #83, p. 35.  He relies on the Supreme Court's statement regarding pleading inconsistent theories.  However, he ignores its subsequent discussion, in which the Court states:

> Nonetheless, in some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim.  Summary judgment for a defendant is appropriate when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An ADA plaintiff bears the burden of proving that she is a "qualified individual with a disability"—that is, a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. 42 U.S.C. § 12111(8). And a plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.

Cleveland, 526 U.S. at 805-06. Plaintiff does state in his affidavit: "I've not taken a legal or factual position inconsistent with the positions I've taken in this lawsuit." Doc. #83-4. That general, conclusory statement is not sufficient, though, to explain the apparent contradiction between plaintiff's claim here and his statements to the Social Security Administration.

---

[17]*It is not altogether clear from the appellate brief when plaintiff was claiming he was unable to work. However, his benefit application states that his disability began June 23, 2010. Doc. #89-7.*

"Where a plaintiff's prior inconsistent position is a claim of total disability made in an SSA proceeding, he is not necessarily estopped from asserting qualification for his job in a subsequent lawsuit," but "must provide an explanation of the apparent inconsistency with the necessary elements of plaintiff's claim."[18]  Mathews v. Denver Newspaper Agency LLP, 649 F.3d 1199, 1209 (10th Cir. 2011).  In the absence of any meaningful attempt to reconcile his inconsistent positions, the court concludes plaintiff is estopped from claiming he is a "qualified individual with a disability" under the ADAAA.[19]

Retaliation

Plaintiff did not respond to defendant's motion insofar as it sought summary judgment on his retaliation claim.  He thereby confessed it.  LCvR7.1(g).  Moreover, because the court has determined that being authorized to drive a Schwan truck was an essential function of plaintiff's position as Facility Supervisor, defendant undisputedly had a legitimate reason -- plaintiff's  inability to be DOT medically qualified –  for placing him on unpaid leave or,

---

[18]*The court recognizes that, in deciding whether to apply judicial estoppel, courts look to such factors as whether ... a party has persuaded a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled. . . ." Mathews, 649 F.3d at 1209. When, as here, a party "makes no effort to explain the apparent inconsistency, as required by Cleveland," id., the court concludes that lack of success in the other proceeding does not prevent the party from being estopped.*

[19]*Another factor considered by the court when deciding whether a party should be estopped is whether "the party seeking to assert the inconsistent position would derive an unfair advantage if not estopped." Mathews, 649 F.3d at 1209 (internal quotations omitted).  As plaintiff has not yet been awarded disability benefits by the Social Security Administration, he would not, if successful on his ADAAA claim here, be "double-dipping" – at least not yet.  Nonetheless, he would be receiving benefits to which, based on his own representations, he is not entitled.*

accepting plaintiff's argument that he was fired, for terminating him.

OADA

"[T]he protections provided by the OADA are co-extensive with the protections provided by federal law under the ADA." Engles v. Hilti, Inc., 2013 WL 1387282, at * 6 (N.D. Okla. Apr. 4, 2013) (internal quotations omitted). Because plaintiff's ADAAA claims fail, his claim under the OADA similarly fails. *Id.*

Burk tort[20]

Defendant initially contends that plaintiff's Burk tort claim is precluded by the November 1, 2011, amendment to the Oklahoma Anti–Discrimination Act ("OADA"), which created a statutory cause of action for employment-based discrimination and abolished "any common law remedies." *See* 25 Okla. Stat. §§ 1101(A), 1350(A). The parties agree that the amendment is not retroactive and applies only to claims accruing after November 1, 2011, but disagree as to the accrual date of plaintiff's Burk claim. Defendant maintains that a claim asserting discrimination accrues when the plaintiff receives a right to sue notice from the Equal Employment Opportunity Commission ("EEOC") or Oklahoma Human Rights Commission. Plaintiff acknowledges that a party must exhaust his administrative remedies before a Burk claim is filed, but contends that a claim accrues after a plaintiff initiates steps to commence it and that occurred here when he filed his EEOC discrimination charge.

---

[20]*The parties proceed as if plaintiff asserted a claim for handicap discrimination both as a Burk tort and under the OADA. That is not evident from the complaint, but the court will assume such a claim was pleaded.*

Under Oklahoma law, "[a] cause of action accrues when the plaintiff could have first maintained an action." *E.g.,* Prince v. Brake Rebuilders & Friction Products, Inc., 298 P.3d 529, 532 (Okla. 2012) (internal quotations omitted). Because a Burk tort claim must be exhausted, some courts have concluded that it can first be maintained only after the plaintiff receives a right to sue letter. Peters v. Black Tie Value Parking Serv., Inc., at *4 (W.D. Okla. Jan. 14, 2013). Although the court has considerable hesitation about that conclusion, *see* Coulter v. Fallin, No. 110,041, slip op. at 8 n.4 (Okla. Civ. App. 2012), it is unnecessary to resolve the issue in light of its conclusion that plaintiff's ADAAA and OADA claims fail on the merits. There is no apparent basis for a different substantive result as to his Burk tort claim. Therefore, defendant is entitled to summary judgment as to that claim as well.

Defendant is entitled to summary judgment on plaintiff's ADAAA discrimination claim because plaintiff is not a "qualified individual with a disability" for purposes of the statute and because plaintiff is estopped from asserting otherwise. Plaintiff's retaliation claim was confessed and defendant undisputedly had a legitimate reason for the adverse action given the court's other conclusions.[21] For the same reason it succeeds on plaintiff's ADAAA discrimination claim, defendant is entitled to summary judgment on plaintiff's

---

[21]*Plaintiff sought leave to file a surreply, which the court denied, on the basis "the motion already sets out essentially the same arguments plaintiff would presumably discuss in the surreply." Doc, #96. The court has considered the arguments made in plaintiff's motion to file a surreply, which pertain to* Knutson *and certain job descriptions. The court did not rely on* Knutson *and found the job descriptions distinguishable but not on the ground they were for jobs at a separate company. While plaintiff noted that defendant had listed new Social Security documents in its reply brief, he states that they had "been adequately addressed by Plaintiff's prior briefing and thus no surreply is required. Doc. #94, p. 1 n.1.*

OADA and <u>Burk</u> tort claims.

Accordingly, defendant's motion for summary judgment [Doc. #70] is **GRANTED**.

In light of the court's resolution of the issues raised by defendant's motion, plaintiff's motion

for partial summary judgment [Doc. #71] is **DENIED in PART** and otherwise **MOOT**.

**IT IS SO ORDERED**.

Dated this 28th day of May, 2013.

JOE HEATON
UNITED STATES DISTRICT JUDGE