FILED
United States Court of Appeals
Tenth Circuit

**February 19, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID HAWKINS,

             Plaintiff - Appellant,

v.

SCHWAN'S HOME SERVICE, INC.,

             Defendant - Appellee.

No. 13-6149

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:12-CV-00084-HE)**

---

Mark E. Hammons (Amber L. Hurst with him on the briefs), Hammons, Gowens, Hurst & Associates, Oklahoma City, OK, for Plaintiff-Appellant.

Alan L. Rupe (Jason M. Janoski with him on the brief), Kutak Rock LLP, Wichita, KS, for Defendant-Appellee.

---

Before **KELLY, LUCERO**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

       David Hawkins filed claims against his former employer, Schwan's Home

Service, Inc. ("SHS"), alleging violations of the Americans with Disabilities Act

as amended ("ADAAA")[1] and Oklahoma law.  The district court granted summary

judgment in favor of SHS.  Exercising jurisdiction under 28 U.S.C. § 1291, we

**affirm**.

I

In 1987, Mr. Hawkins began working for SHS, a company that sells and

delivers frozen food products throughout the United States.  He became a facility

supervisor at SHS's Alva, Oklahoma, sales and distribution depot in 2003 and, at

all times relevant to these proceedings, reported to Jim Hillaker, the depot's

territory sales leader.  Mr. Hawkins has described his chief responsibilities as

---

[1]       Although Mr. Hawkins initially stated that he was bringing his
federal claims pursuant to "the Americans with Disabilities Act," or "ADA," "as
set forth in 42 U.S.C. § 12111," Aplt. App. at 1 (Compl., filed Jan. 25, 2012), he
argued in subsequent briefing that he was "a disabled person under the ADAAA,"
*id.* at 182 (Mot. for Partial Summ. J., filed Mar. 15, 2013).  The district court
analyzed the parties' cross-motions for summary judgment by noting that the
ADAAA applied generally and then by discussing the "essential-qualifications"
issue with reference to the ADA standard.  *See id.* at 1054–56 (Order, filed May
28, 2013).  We discern nothing objectionable about this approach.  As we have
explained, Congress's "express purpose" in amending the ADA was to "revers[e]
the narrow judicial interpretation of *disability* . . . by, inter alia, expanding what
is considered a major life activity and directing courts to interpret 'substantial
limitation' broadly in favor of coverage."  *Smothers v. Solvay Chems., Inc.*, 740
F.3d 530, 545 n.16 (10th Cir. 2014) (emphasis added) (citations omitted).
Accordingly, noting that the scope of this appeal is confined to whether Mr.
Hawkins was a *qualified* individual with a disability—and that the question of his
disability *vel non* is not disputed here—we will (1) accept the premise that Mr.
Hawkins's lawsuit proceeds under the ADAAA (and refer to the ADAAA as the
relevant statute *infra*); and (2) as the district court did, apply the standards of the
ADA—which have continued in force after the amendments and were not affected
by them—in our discussion of whether Mr. Hawkins was a "qualified" individual
within the meaning of the statute.

"ordering products to be delivered by [SHS's] delivery drivers, scheduling, and loading trucks with products." Aplt. App. at 3.

SHS has an official written description for the facility-supervisor position. That document indicates that a facility supervisor serves the purpose of "supervising the depot material handlers and coordinat[ing] the product receiving and material handling activities necessary to fulfill the sales activities at assigned depot(s)." *Id.* at 594 (Position Description, dated Apr. 2005). The job description's "Duties and Responsibilities" section provides, in pertinent part, that a facility supervisor "[e]xecutes the company's Good Warehouse Practices (GWP) and follows any government regulations" and manages the company's fleet of delivery trucks, "which includes maintaining Department of Transportation (DOT) compliance files . . . , vehicle registration and license, and periodic fleet safety inspections." *Id.*

According to Mr. Hillaker, who supervised truck operations as part of his leadership duties, fleet management often included driving company trucks to service appointments or otherwise "[s]huttling trucks to salespeople" to ensure product delivery. *Id.* at 603 (Hillaker Dep., dated Jan. 22, 2013). Mr. Hillaker's observation that the facility-supervisor position involved driving is bolstered by the "Qualifications" section of SHS's facility-supervisor job description, which indicates that an "excellent driving record" is required. *Id.* at 594 (capitalization altered). The job description further specifies that "meet[ing] the Federal

3

Department of Transportation eligibility requirements, including appropriate driver's license and corresponding medical certification," is a "condition of employment for this position." *Id.* Additionally, it lists several "essential abilities and functions" that directly implicate health and physical abilities, such as seeing, balancing, moving continuously, lifting and pulling up to fifty pounds, and using precise hand movements. *Id.* at 596 (capitalization altered).

In 2007, when the Alva depot "shut . . . down for a period of time," SHS "had [Mr. Hawkins] drive [company] trucks from Alva to Enid to load and drive the truck back from Enid to Alva, and then do the same in Woodward . . . [and] Laverne." *Id.* at 632 (Hawkins Dep., dated Dec. 5, 2012). Doing so required Mr. Hawkins to be "DOT-qualified and have a Medical Examiner's Certificate." *Id.* at 834 (Valade Decl., dated Mar. 23, 2013). Matthew Valade, who was a facility supervisor at the Alva depot in 2011, explained that these were run-of-the-mill requirements. Indeed, during Mr. Valade's interview, Mr. Hillaker indicated that Mr. Valade "m[ight] have to drive a Schwan's route truck as part of [the] job." *Id.* For his part, Mr. Hawkins has acknowledged that SHS mandated a DOT medical certification, and he has offered documentation to corroborate his prior compliance with that requirement.

Mr. Hawkins suffers from several health conditions that came to a head in 2010. Beginning in March of that year, he was "in and out of the hospital . . . with heart problems and fainting spells and very high blood

4

pressure." *Id.* at 540 (Email from David Hawkins to Jeff Booth, dated June 14, 2010). Mr. Hawkins experienced a minor stroke in June of 2010, but he resumed working soon afterward. In order to manage his symptoms, Mr. Hawkins had a pacemaker implanted and followed a comprehensive medication regimen. During this time period, several of Mr. Hawkins's coworkers communicated to him that they were concerned about his health.

On June 14, 2010, Mr. Hawkins emailed human-resources manager Jeff Booth to report that Mr. Hillaker wanted him "to drive trucks back and [forth] to" a mechanic in Enid, Oklahoma, as well as "to drivers on routes" in Woodward, Oklahoma. *Id.* At a subsequent deposition, Mr. Hawkins explained that these requests had taken place in May and June of 2010—when his health issues were escalating—and that Mr. Hillaker was "telling everyone in Enid" that Mr. Hawkins was "a liability." *Id.* at 632 (internal quotation marks omitted). He further suggested that SHS typically did not require facility supervisors to drive trucks to the mechanic, *see id.* at 631–32, and that he believed Mr. Hillaker had begun asking *him* to do so in order to "force[ ] [him] to quit," *id.* at 631. Melvin Casion, who worked in operations at SHS, offered similar testimony—*viz.*, that Mr. Hillaker had expressed that he was "very upset about [Mr. Hawkins] being in the hospital . . . [and] wanted him gone." *Id.* at 263 (Casion Dep., dated Sept. 19, 2012).

On June 21, 2010, Mr. Hawkins failed a routine DOT medical evaluation.

*See id.* at 478 (Med. Examination Report, dated June 21, 2010) (marked "based on health history above[,] not able to pass" (capitalization altered)).  He therefore did not receive the medical certification SHS demanded of all facility supervisors. The next day, SHS gave Mr. Hawkins a letter notifying him that he had "been placed on a 30 day company requested unpaid leave, effective June 21, 2010, because [he] did not pass [his] DOT recertification."  *Id.* at 229 (Letter from Nancy Green to David Hawkins, dated June 22, 2010).  The letter informed Mr. Hawkins that he had thirty days to obtain this certification or "to find a non-DOT position."  *Id.*  Mr. Hawkins subsequently testified that he perused job listings on SHS's public website.  However, he "did not apply for any jobs."  *Id.* at 1053.

On June 23, 2010, Mr. Hawkins signed a termination form that stated, in relevant part, as follows:

> I, David Hawkins, hereby voluntarily resign from my position as Facility Manager[] with Schwan's, Inc.[,] a subsidiary corporation of The Schwan Food Company.  In voluntarily resigning my employment, I acknowledge that I am taking this action for the following reason(s)[,] . . . which is unrelated to any action or statement(s) made in conjunction with, by, or on behalf of my employer, or any representation of my employer.

*Id.* at 230 (Termination Form, dated June 23, 2010) (capitalization altered). Despite the foregoing language indicating that his resignation was voluntary, Mr. Hawkins wrote on the form that the reason for his action was: "Force[d] to quit for medical reason."  *Id.* (capitalization altered).

Before his separation from SHS, Mr. Hawkins began the process of seeking

6

Social Security Disability Insurance ("SSDI") benefits from the Social Security Administration ("SSA"). In his SSDI application, which he signed on April 6, 2010, he stated that he was unable to work and had "not been able to work for 5 weeks." *Id.* at 1002 (SSDI Appl., dated Apr. 6, 2010) (capitalization altered). He also indicated that one of his daily activities was to "transport trucks." *Id.* at 997 (capitalization altered). The SSA denied Mr. Hawkins's claim "initially on October 14, 2010, and upon reconsideration on January 10, 2011." *Id.* at 925 (SSA Decision, dated Nov. 4, 2011). After a September 2011 hearing, an administrative law judge determined that Mr. Hawkins was not disabled.

In a brief submitted to the SSA Appeals Council through his claims representative, Mr. Hawkins alleged that the "record [would] show that Mr. Hawkins would have difficulty with sustained work." *Id.* at 822 (Appeal Br., dated Dec. 21, 2011). He characterized his physical status as "less than sedentary" and claimed that he was incapable of participating in "*any* type of substantial gainful activity." *Id.* at 823 (emphasis added). However, Mr. Hawkins also represented that, "had he been offered a job during the time of receiving unemployment, he was willing to at least try to do the work." *Id.* His SSDI application remained on appeal at the time the district court issued the ruling that we review.

Mr. Hawkins filed his complaint in the United States District Court for the

Western District of Oklahoma on January 25, 2012,[2] bringing claims under the ADAAA and the Oklahoma Anti-Discrimination Act ("OADA"), and asserting a *Burk* tort.[3]  In March 2013, he sought partial summary judgment on his ADAAA discrimination claim.  Shortly thereafter, SHS filed its own cross-motion for summary judgment on all claims.  The district court resolved these motions in SHS's favor on May 28, 2013.

In its summary-judgment order, the district court rejected Mr. Hawkins's ADAAA discrimination claim, concluding that Mr. Hawkins was not a qualified individual with a disability because he could not perform the essential function of securing DOT certification for driving SHS's vehicles.  Moreover, "[e]ven if . . . being DOT qualified was not an essential function," the court continued, Mr. Hawkins's ADAAA discrimination claim "would nonetheless fail on the basis of estoppel" due to his conflicting representations to the SSA.  *Id.* at 1064.  The district court then explained that SHS was entitled to summary judgment on Mr. Hawkins's ADAAA retaliation claim because Mr. Hawkins had not addressed it in

---

[2]     Before filing his complaint, Mr. Hawkins properly filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Oklahoma Human Rights Commission.  The EEOC issued a notice of right to sue on January 12, 2012.

[3]     A *Burk* tort "is said to arise . . . where an employee is discharged for (1) refusing to violate an established and well-defined public policy or (2) performing some act consistent with a clear and compelling public policy." *Darrow v. Integris Health, Inc.*, 176 P.3d 1204, 1210 (Okla. 2008); *see Burk v. K-Mart Corp.*, 770 P.2d 24, 28 (Okla. 1989).

his briefing.  Next, noting the coextensive character of ADAAA and OADA actions, the court summarily rejected Mr. Hawkins's OADA claim.  For substantially the same reasons, the court rejected Mr. Hawkins's *Burk* tort claim as well.

This timely appeal followed.

## II

Before taking up Mr. Hawkins's arguments for reversal, we set forth the legal standards applicable to his federal disability-discrimination claim.

## A

"We review the district court's grant of summary judgment de novo, applying the same standard as the district court." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011); *accord Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 604 (10th Cir. 2012).  In doing so, "[w]e view the facts, and all reasonable inferences those facts support, in the light most favorable to the nonmoving party."  *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011).  Generally, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (internal quotation marks omitted).

"Where appropriate, we may grant summary judgment 'in favor of any moving party we conclude is entitled to summary judgment on the record before us.'" *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005) (quoting *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1120 (10th Cir. 2002)). As long as "the facts were fully developed at [summary judgment] so that the court of appeals can determine that the nonmoving party clearly was entitled to a judgment as a matter of law, an entry of judgment for the nonmoving party may be proper" as well. *Dickeson v. Quarberg*, 844 F.2d 1435, 1445 n.8 (10th Cir. 1988) (internal quotation marks omitted).

## B

Because Mr. Hawkins contends that SHS intentionally discriminated against him by terminating him because he was disabled, this lawsuit presents a claim of disparate-treatment discrimination. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1189 (10th Cir. 2003). We have described the prima facie case for such a claim as "not onerous." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks omitted). More specifically, Mr. Hawkins must show that when his employment with SHS terminated, "(1) he was a disabled person as defined by the [statute]; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was fired because of his disability." *Carter v. Pathfinder Energy Servs., Inc.*,

10

662 F.3d 1134, 1142 (10th Cir. 2011); *accord Zwygart v. Bd. of Cnty. Comm'rs*,

483 F.3d 1086, 1090 (10th Cir. 2007).  It is also incumbent upon him at the

summary-judgment phase to "rais[e] a genuine issue of material fact on each

element of his prima facie case."  *Davidson*, 337 F.3d at 1189.

We generally review disparate-treatment claims under the framework of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Davidson*, 337

F.3d at 1189; *accord Hardy v. S.F. Phosphates Ltd.*, 185 F.3d 1076, 1079 (10th

Cir. 1999).  However, we have explained that *McDonnell Douglas*'s "burden-

shifting framework may be unnecessary and inappropriate" where, as here, there

is direct evidence of discrimination.  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323

n.3 (10th Cir. 1997); *accord Davidson*, 337 F.3d at 1189.[4]  Under these

circumstances, the employer "will defend its decision on the ground that the

plaintiff is not otherwise qualified for the position, with or without reasonable

accommodation," within the meaning of the ADAAA.  *Davidson*, 337 F.3d at

---

[4]        "Direct evidence is evidence from which the trier of fact may
conclude, without inference, that the employment action was undertaken because
of the employee's protected status [, i.e., disability]."  *Sanders v. Sw. Bell Tel.,
L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008).  Here, the district court concluded
that there was direct evidence of discrimination "in light of the much broadened
definition of disability," medical evidence submitted by Mr. Hawkins, and SHS's
"admi[ssion] that [Mr. Hawkins's] heart condition . . . played a prominent part in
its decision to place him on unpaid leave."  Aplt. App. at 1055 (internal quotation
marks omitted); *see also* Aplee. Br. at 11 ("stipulat[ing] that Hawkins's medical
conditions prevent[ed] him from obtaining a DOT medical certification," which
led to the adverse employment action).

1189.

At this point, the plaintiff's status as a *qualified* individual with a disability becomes "the determinative issue in the case." *Id.* We then consider "two criteria"—*viz.*, (1) "whether [the plaintiff's] impairment prevented [him] from performing the essential functions of [his] job," and (2) "[i]f so, . . . whether [he] might have nevertheless been able to perform those functions if the [employer] provided [him] a reasonable accommodation." *Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1216 (10th Cir. 2012). To be clear, however, we will not obligate an employer to create a position out of wholecloth to accommodate the individual in question. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174–75 (10th Cir. 1999) (en banc); *accord Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004).

The ADAAA defines a "qualified individual" as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that [he] holds or desires." 42 U.S.C. § 12111(8). Under the statute, "consideration *shall* be given to the employer's judgment as to what functions of a job are essential," and an employer's written job description "*shall* be considered evidence of the essential functions of the job." *Id.* (emphases added). Further, the statute contemplates a broad array of "reasonable accommodations" that may include, *inter alia*, "job restructuring, . . . modified work schedules, reassignment to a vacant position, acquisition or modification of

12

equipment or devices, . . . or policies, . . . and other similar accommodations."

*Id.* § 12111(9)(B).  We have consequently said that "[u]nder the ADA[AA], [a plaintiff] is a qualified individual as long as he can perform a job [offered by the employer] that he desires."  *Davidson*, 337 F.3d at 1190 (internal quotation marks omitted); *cf. Midland Brake*, 180 F.3d at 1161 ("Although a 'qualified individual with a disability' has to be someone who can perform the essential functions of a job, that inquiry is not limited to the employee's existing job.  Rather, the plain language of the statute includes an employee who has the ability to do other jobs within the company that such disabled employee 'desires.'" (quoting 42 U.S.C. § 12111(8))).

The ADAAA's implementing regulations, duly promulgated by the EEOC, define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires," but "not . . . the marginal functions of the position."  29 C.F.R. § 1630.2(n)(1).  A particular job duty "may be essential because the reason the position exists is to perform that function," *id.* § 1630.2(n)(2)(i), or "because of the limited number of employees available among whom the performance of that job function can be distributed," *id.* § 1630.2(n)(2)(ii).  As discussed *infra*, our disability-discrimination caselaw explicitly incorporates the EEOC's regulations, *see Wells v. Shalala*, 228 F.3d

1137, 1144 (10th Cir. 2000),[5] and counsels in favor of deference to an employer's

judgment concerning essential functions, *see Tate v. Farmland Indus., Inc.*, 268

F.3d 989, 993 (10th Cir. 2001) (noting that our "inquiry is not intended to second

guess the employer"); *cf. Davidson*, 337 F.3d at 1191 (explaining that some

deference is due because "[d]etermining whether a particular function is essential

is a factual inquiry").  This approach is consonant with Congress's indication that

"[b]y including the phrase 'qualified individual with a disability,' the Committee

intends to reaffirm that this legislation does not undermine an employer's ability

to choose and maintain qualified workers."  H.R. Rep. No. 101-485(II), at 55

(1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 337.

### III

Mr. Hawkins contends that the district court's application of the foregoing

---

[5]      In *Wells*, we observed the D.C. Circuit's "suggest[ion] that whether
an individual is 'qualified' for a job may, depending upon the circumstances,
present a question of fact or a question of law."  228 F.3d at 1144 n.5.  We did
not choose between those two approaches, though, for we found that the plaintiff
would lose as a matter of law in any event.  *See id.*  Then, in *Mason*, while stating
that "whether an employee can perform the essential functions of her job is a
mixed question of law and fact," we still resolved the appeal as a matter of law.
357 F.3d at 1122; *see id.* ("*Assuming* a jury may determine the essential functions
of a job, we conclude [that this] case is not one in which the essential function
inquiry must go to the jury because no reasonable jury could find for [the
plaintiff] applying the [EEOC's] factors.").  No additional inquiry on this score is
required here.  This is so because, much like in *Mason* and *Wells*, the district
court assessed the facts presented and then, applying the EEOC factors, made the
*legal* determination that Mr. Hawkins could not perform the essential function of
driving DOT-regulated route trucks.  We consequently need not resolve the fact-
law question to which the *Wells* court alluded.

principles was infected by multiple legal errors. He primarily disputes the court's determination that driving a DOT-regulated truck was an "essential function" of SHS's facility-supervisor position. In doing so, he submits that the district court incorrectly allocated the relevant burdens between the parties *and* "fail[ed] to distinguish between qualifications and functions." Aplt. Opening Br. at 22. He also challenges the court's reliance upon estoppel as an alternative basis for granting summary judgment, arguing that "estoppel can only be granted based on sworn declarations." *Id.* at 15.

In affirming the district court, we cabin our analysis to the court's conclusion that Mr. Hawkins failed to make a prima facie ADAAA case. The district court's well-reasoned analysis on this issue, standing alone, provides a strong foundation for affirmance. In particular, we conclude that the district court (1) correctly assigned the burdens between the parties and (2) did not conflate the "qualifications" and "functions" terms. We need not—and thus do not—address Mr. Hawkins's estoppel theories. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) (noting that "we may affirm on any basis supported by the record").

## A

In urging reversal, Mr. Hawkins primarily argues that the district court erroneously assigned to him—as opposed to SHS—the burden of proving that the ability to drive DOT-regulated trucks was an essential function of the facility-

supervisor position.  Our assessment of this argument, which we ultimately reject, proceeds in three steps.  First, we clarify the applicable terms that form the basis of Mr. Hawkins's contentions regarding the allocation of the burden.  Second, we explain the analytical roadmap provided by our caselaw and conclude that the district court's ruling reflects its principled adherence to this approach.  And, third, we explain why the authorities upon which Mr. Hawkins relies lend him no succor.

### 1

At the outset, Mr. Hawkins insists that "it is the employer's burden of proof to establish that a function is 'essential.'"  Aplt. Opening Br. at 17 (capitalization altered).  He explains that the district court "did not expressly address the allocation of proof on this issue"—*viz.*, the question of whether a job function is "essential"—but, rather, patently "placed the burden on Mr. Hawkins."  *Id.* at 20. He also submits that, because "this Circuit has not *directly* addressed that burden," *id.* at 18, reversal is proper.  Though we do not gainsay the vital role that assigning burdens can play in the disposition of a lawsuit, *see Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 55–56 (2005) (noting that certiorari was granted to resolve a dispute concerning burden allocation), we are not situated to reverse on the basis of Mr. Hawkins's misallocated-burden theory.

Addressing Mr. Hawkins's assertions in this regard requires some unpacking of his chosen terminology.  Mr. Hawkins's use of the phrase "burden

of proof" is less than pellucid.  To be sure, the Supreme Court has recognized that "[t]he term 'burden of proof' is one of the 'slipperiest member[s] of the family of legal terms.'"  *Schaffer*, 546 U.S. at 56 (second alteration in original) (quoting 2 J. Strong, *McCormick on Evidence* § 342, at 433 (5th ed. 1999)).  The Court has clarified that "[h]istorically, the term has encompassed *two separate burdens*: the burden of *persuasion* (specifying which party loses if the evidence is balanced), as well as the burden of *production* (specifying which party must come forward with evidence at various stages in the litigation)."  *Microsoft Corp. v. i4i Ltd. P'ship*, --- U.S. ----, 131 S. Ct. 2238, 2245 n.4 (2011) (emphases added) (internal quotation marks omitted).  However, time and again, the Court has articulated the "ordinary default rule" that "plaintiffs bear the risk of failing to prove their claims."  *Schaffer*, 546 U.S. at 56; *accord Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 91–92 (2008).

This court has likewise alluded to the linguistic difficulty inherent in the concept of "burden."  *See, e.g.*, *Esgar Corp. v. Comm'r*, 744 F.3d 648, 654 (10th Cir. 2014) ("In a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance." (internal quotation marks omitted)); *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1116 (10th Cir. 2007) ("In the employment

17

discrimination context, there is no need for a trial if one party has failed to *produce* sufficient evidence to carry its burden of *persuasion*. It is therefore appropriate for a court to reference the burdens of *proof* . . . ." (emphases added)); *Prince v. Leesona Corp.*, 720 F.2d 1166, 1173 & n.11 (10th Cir. 1983) (finding no error in a jury instruction stating: "Burden of proof means burden of persuasion. A party who has the burden of proof must persuade you that his claim is more probably true than not true. In determining whether a party has met this burden, you will consider all the evidence, whether produced by the plaintiff or the defendant.").

Collectively, we read our caselaw as making three salient points regarding the burden issue. The first of these is that "burden of proof" is an umbrella term "encompassing the burdens of both production and persuasion." *Qwest Corp. v. FCC*, 689 F.3d 1214, 1225–26 (10th Cir. 2012).[6] The second is that *both* parties shoulder the burden of presenting evidence at some point in the litigation. *See, e.g.*, *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995) (noting that the plaintiff "has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence" (quoting *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 308

_____

[6]     A well-regarded legal dictionary embraces this understanding of the term. *See Black's Law Dictionary* 223 (9th ed. 2009) ("The burden of proof includes both the burden of persuasion and the burden of production." (italics omitted)).

(5th Cir. Unit A Nov. 1981)) (internal quotation marks omitted)); *see also Tate*, 268 F.3d at 993 (noting that a plaintiff who "fails to establish" his prima facie disability-discrimination case cannot prevail). The third point—and arguably the one most applicable to this appeal—is that "the plaintiff *at all times bears the ultimate burden of persuading* the trier of fact that he has been the victim of illegal discrimination based on his disability." *White*, 45 F.3d at 361 (emphasis added).

Notwithstanding these bedrock principles, Mr. Hawkins challenges the district court's ultimate assignment of the burden of persuasion to him. In this regard, he avers that "[s]ummary judgment is most often entered against the party bearing the burden of proof [and] cases in which summary judgment is granted in favor of the party bearing the burden of persuasion . . . will be rare." Aplt. Opening Br. at 19 (alterations and omission in original) (emphases omitted) (quoting *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n.12 (7th Cir. 1998)) (internal quotation marks omitted). Mr. Hawkins can ultimately be heard to argue that, even if both parties were obligated to adduce some evidence at summary judgment regarding whether truck-driving is an essential function of the facility-supervisor job, *SHS* should have borne the burden of "first" persuading the factfinder that it was an essential function if the evidence was in equipoise. *See id.* at 18 (questioning "who has the burden of first proving whether a function is essential" (internal quotation marks omitted)); *id.* at 20

19

("Because the employer clearly has superior knowledge as to the relevant factors

[of the job], . . . the employer has the burden of [persuasion].").

**2**

Having clarified these critical terms, we turn to the district court's

allocation of the burden in its ruling.  We first discuss its obligation under our

precedent, which provides a principled course for courts to follow in cases such

as Mr. Hawkins's.  We then review the district court's actual analytical trajectory

and conclude that it faithfully followed our circuit precedent.  Notably, we find

that the court properly analyzed Mr. Hawkins's disability-discrimination claim

using a rubric from which we are not situated to deviate.

**a**

Our ADAAA roadmap is clearly articulated in *Wells v. Shalala*, 228 F.3d at

1144.  In that case, we explained that "a two-part analysis" guides our inquiry as

to whether a plaintiff is "qualified" for his former position.  *Id.*  We characterized

the first step of that analysis as "determin[ing] whether [the plaintiff] can perform

the essential functions of the job, *i.e.*, functions that bear more than a marginal

relationship to the job at issue."  *Id.*  We then expressly indicated that such a

determination involves consulting the regulatory factors provided by the EEOC,

to wit:

> Evidence of whether a particular function is essential to a job
> includes (but is not necessarily limited to) (1) the employer's
> judgment as to which functions are essential, (2) written job

> descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs.

*Id.* (citing 29 C.F.R. § 1630.2(n)(3)). As for the second part, we stated that "if we conclude that Plaintiff is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by [the employer] would enable him to perform those functions." *Id.*

*Wells* is particularly useful to our growing body of disability jurisprudence because it indicates our intent to incorporate the EEOC regulations in decisionmaking. Further, as relevant here, it demonstrates that implementing those regulations necessarily places considerable weight on an employer's judgment concerning a particular job's "essential" functions. We did precisely that in *Wells* when we deemed the plaintiff's single, self-serving affidavit woefully insufficient to overcome the employer's "overwhelming evidence"—including a written job description and affidavits from three company supervisors—that travel was an "essential" function of the disputed position. *Id.* at 1144–45.

In *Mason v. Avaya Communications*, we strengthened the foundation provided by *Wells*, emphasizing once more that the factors listed at 29 C.F.R. § 1630.2 are part and parcel of our essential-function inquiry. *See* 357 F.3d at 1119 (referencing the EEOC's prescribed regulations). And we unmistakably

21

signaled that the *Wells* rubric contemplates deference to an employer's judgment.

*See id.* (stating that we are "require[d]" to "consider the employer's judgment as

to what functions of a job are essential" (internal quotation marks omitted)).  We

described the prototypical analysis in that regard as follows:

> The employer describes the job and functions required to perform
> that job.  We will not second guess the employer's judgment
> when its description is job-related, uniformly enforced, and
> consistent with business necessity.  In short, the essential
> function inquiry is not intended to second guess the employer or
> to require the employer to lower company standards.

*Id.* (citations omitted) (internal quotation marks omitted).

Under that approach in *Mason*, we cited with approval the employer's

"present[ation of] evidence to the district court demonstrating four of the

evidentiary factors set forth by the EEOC regulations," *id.* at 1120—evidence

which was then appropriately weighed against the plaintiff's offering.  Observing

that the plaintiff had "simply point[ed] out that [the employer] did not present any

evidence [on an issue she found significant]," *id.* at 1121, we agreed with the

district court that the plaintiff had lost the evidentiary tug-of-war.  In so doing,

we expressly found that the plaintiff had "not *persuaded*" us to accept her view

that the disputed functions were non-essential in the context of the statute.  *Id.* at

1121–22 (emphasis added).  *Mason* therefore serves as a natural extension of

*Wells* by incorporating the factors referenced by the EEOC, by requiring the

employer to produce some evidence, and by affording respect to the employer's

judgment.[7]

Our subsequent caselaw, in recapitulating this rubric, lends the important consideration that, in the "necessary first step [of] identify[ing] the 'essential functions' of the position[,] . . . the employer's judgment is not conclusive evidence." *EEOC v. Picture People, Inc.*, 684 F.3d 981, 997 (10th Cir. 2012). Indeed, despite our usual deference to an employer's adoption of qualifications based on its judgment and experience, we have firmly held that "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Id.* (quoting *Davidson*, 337 F.3d at 1191) (internal quotation marks omitted). But it bears repeating that, in the end, "[w]e weigh heavily the employer's judgment regarding whether a job function is essential." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009).

---

[7]      Our explication of *Mason* demonstrates why Mr. Hawkins's reliance upon it is misplaced. Mr. Hawkins emphasizes the fact that the *Mason* employer presented evidence concerning the EEOC factors—but he reasons from that fact that this "inferentially supports that the employer possessed the burden of proof." Aplt. Opening Br. at 18. Though we acknowledge that *Mason* does not expressly "answer the initial question of who has the burden of *first* proving whether a function is 'essential,'" *id.* (emphasis added), *Mason* unquestionably incorporates the *Wells* rubric, and we must abide by our unavoidable rule that "the plaintiff *at all times bears the ultimate burden of persuading* the trier of fact that he has been the victim of illegal discrimination based on his disability," *White*, 45 F.3d at 361 (emphasis added), which we followed in *Mason*.

23

**b**

Next, we assess the district court's adherence to the decisional path paved by our caselaw. We conclude that the court thoroughly reviewed the facts and then made the legal determination that Mr. Hawkins failed to carry his burden of persuasion on whether DOT certification was an essential function of his desired position. That legal determination then justified the court's rejection of Mr. Hawkins's claim that he was a qualified individual with a disability. Consequently, we affirm.

Courts require an employer to come forward with evidence concerning whether a job requirement is an essential function. *See, e.g.*, *Mason*, 357 F.3d at 1120 (considering the employer's evidence with respect to various factors enumerated in the EEOC regulations); *White*, 45 F.3d at 362 (analyzing evidence offered by the employer to determine the essential functions even *before* the employee demonstrated hypothetical accommodations); *accord Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 991 (9th Cir. 2007) (en banc) ("[A]n employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions." (internal quotation marks omitted)); *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1113 (8th Cir. 1995) ("Because Northwest[, the employer,] disputes Benson's evidence that he can perform the essential functions of the mechanic's job, it must put on *some evidence* of those essential functions." (emphasis added)). A job function may be

24

essential—i.e., a fundamental duty of the relevant position, *see* 29 C.F.R.

§ 1630.2.(n)(1)—because performing it is the reason *for* the position, or because

few employees are available to perform it, *see id.* § 1630.2(n)(2).[8]

Bearing the foregoing in mind, the district court here specified the

regulatory factors that would shape its assessment of Mr. Hawkins's claim—and,

by extension, its ruling on whether DOT certification was an "essential function"

of the facility-supervisor job with SHS:

> [t]he employer's judgment as to which functions are essential;
> [w]ritten job descriptions prepared before advertising or
> interviewing applicants for the job; [t]he amount of time spent on
> the job performing the function; [t]he consequences of not
> requiring the incumbent to perform the function, and [t]he current
> work experience of incumbents in similar jobs.

Aplt. App. at 1056–57 (alterations in original) (internal quotation marks omitted).

The district court was entitled to narrow the scope of its inquiry in such a

reasonable fashion, given the EEOC's guidance that 29 C.F.R. "Part 1630 lists

various types of evidence . . . . [T]he list is not exhaustive." 29 C.F.R. § 1630

app. (commenting on § 1630.2(n)).

With regard to the first factor—SHS's judgment—the district court

_____

[8]      Mr. Hawkins contends that the second of these grounds is "[t]he only
possible basis . . . for finding driving a commercial vehicle to be essential." Aplt.
Opening Br. at 28. However, he offers no legal substantiation for the proposition
that *only* 29 C.F.R. § 1630.2(n)(2)(ii) ("limited number of employees available"
to perform the function) should inform our decision, and we will not make that
argument on his behalf. *See United States v. Yelloweagle*, 643 F.3d 1275, 1284
(10th Cir. 2011).

considered it "clear that [SHS] considered being DOT qualified to operate a [company] route truck an essential job function." Aplt. App. at 1059. The court focused on SHS's judgment as follows:

> [SHS] asserts that its facility supervisors must be authorized to operate DOT regulated vehicles so they could pick up and deliver vehicles for service and repair and facilitate the fueling and the loading and unloading of goods from the vehicles. While a facility supervisor might not have to operate a commercial vehicle on a daily basis, [SHS] claims it was essential that [Mr. Hawkins] be able, as supervisor, to assume the task of his supervised employees, when needed to prevent the disruption of its business.

*Id.* It further considered SHS's choice to require many physical abilities of its facility supervisors, *see id.* at 1058, and SHS's proffered "evidence of different situations where[,]" in SHS's judgment, "the facility supervisor would need to drive" to avoid disrupting business, *id.* at 1059.

Our precedent, which requires courts to "weigh *heavily* the employer's judgment regarding whether a job function is essential," *Hennagir*, 587 F.3d at 1262 (emphasis added), indicates that the district court's deference to SHS's articulation of the facility-supervisor's role was justified. There is no doubt in this circuit that "[i]t is [an] employer's province to define the job and the functions required to perform it." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1177 (10th Cir. 1999). The district court's "inquiry is not intended to second guess the employer or to require [it] to lower company standards." *Davidson*, 337 F.3d at 1191. We are satisfied that the district court heeded this

26

rule and properly refrained from "act[ing] as a super personnel department that

second guesse[d] [SHS's] business judgments" regarding Mr. Hawkins's former

position. *Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1133 (10th Cir. 2014) (internal

quotation marks omitted).[9]

The second pertinent factor in the district court's calculus was SHS's

official written description corresponding to the facility-supervisor position,

which contemplated fleet management, DOT certification and associated

credentialing, and an "excellent driving record."  Aplt. App. at 594 (capitalization

altered).  The district court found that this factor overwhelmingly favored SHS,

and thus rejected Mr. Hawkins's contention that the job description did not

"facially" require truck-driving.  *See id.* at 1057 (internal quotation marks

omitted).  In so doing, the court found that being DOT-certified (and, by

extension, being able to drive SHS's trucks) was "consistent with the specified

––––––––––––––––––––––––––––

[9]     Mr. Hawkins purports to challenge the district court's assessment of
this factor by stating that because "no preexisting memos or directives" apprised
facility supervisors of the DOT-certification requirement, this "failure to
document" should have "created a credibility issue for the jury as to whether this
was really the employer's judgment or whether it was a pretext to screen out
disabled employees."  Aplt. Opening Br. at 28–29.  Yet, Mr. Hawkins cites to no
legal authorities that suggest—much less command—that we should treat these or
similar circumstances as engendering a jury issue regarding pretext.  Nor does
Mr. Hawkins offer cogent argument or anything else to validate this nebulous
assertion.  In view of the undeveloped nature of this argument in his briefing, we
decline to pursue the matter further.  *See, e.g.*, *Bronson v. Swensen*, 500 F.3d
1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments
that are . . . inadequately presented[ ] in an appellant's opening brief.").

duties, when . . . considered *in the context* of the type of business [of SHS] and how it operated." *Id.* at 1057–58 (emphasis added). Put otherwise, the court found the job description's failure to invoke the word "driving" unremarkable, particularly in light of the fact that the document implicitly "identified [driving] as one of the job qualifications." *Id.* at 1059.

We find no fault with the district court's context-based assessment of SHS's written job description. Our caselaw readily supports the court's prerogative to view the description through a broad lens, considering all relevant circumstances of the position. *See, e.g.*, *Davidson*, 337 F.3d at 1191 (noting that the court undertakes a multi-factor assessment that "*includ[es]* those functions contained in a written job description" (emphasis added)); *cf. Frazier v. Simmons*, 254 F.3d 1247, 1258 (10th Cir. 2001) ("Our case law recognizes an employer may require an employee to perform a multitude of tasks in a wide range of environments." (internal quotation marks omitted)). Notably, in *Robert*, we rejected the argument of the plaintiff, an offender supervisor, that fieldwork—mentioned in some portions of the job description, but not the "essential functions" section—was non-essential. *See* 691 F.3d at 1216–17. Assessing the full complement of duties assigned to that position, we reasoned: "[S]upervising offenders in-person was clearly an essential function . . . . So too was conducting visits to their homes and workplaces." *Id.* at 1216. We were further persuaded by the fact that the plaintiff's failure to perform that function

28

"caused strain in her small office."  *Id.*

Similarly, in *Mason*, when "the only evidence [the plaintiff] proffered in support of her argument that she could perform the essential functions of her job from home, other than her own self-serving testimony, was the absence of attendance, supervision, and teamwork from the service coordinator job description," we concluded that context and "commonsense suggest[ed]" otherwise.  357 F.3d at 1121–22.  We willingly accepted there that a job description need not be Byzantine or prolix in order to be deemed sufficient—and, in fact, intimated that certain essential functions could be "a given" when considering the job in context.  *Id.* at 1122.  All of the foregoing principles apply with equal force here.

Furthermore, we are not persuaded by Mr. Hawkins's suggestion that driving a commercial vehicle is uniquely non-essential to the general position of *supervisor*.  He contends that "supervising" and "coordinating"—both listed in the job description—do not necessarily require a facility supervisor to assume the duties of a subordinate.  But, as the district court observed, SHS presented evidence demonstrating that such flexibility was critical to its business model.  That is, SHS could not always anticipate when a driver would be needed in a pinch; its route and driver changes occurred frequently, and the DOT's hours-of-service rules often impacted whether materials handlers could bring trucks back for re-stocking.  Mr. Hawkins has at no point meaningfully refuted that evidence.

29

We therefore have little trouble concluding that "coordinat[ing] the product receiving and material handling activities necessary to fulfill the sales activities at [his] assigned depot," Aplt. App. at 594, required *some* modicum of ability of a facility supervisor, like Mr. Hawkins, to operate the trucks in his fleet.

The third factor considered in the essential-function inquiry is the amount of time spent performing the disputed function. *See* 29 C.F.R. § 1630.2(n)(3)(iii). Here, while remarking that "a facility supervisor might not have to operate a commercial vehicle on a daily basis," Aplt. App. at 1059, the district court nonetheless found it relevant that Mr. Hawkins *had* previously been called upon to drive fleet trucks, *see id.* at 1061 ("If plaintiff had never had to drive a truck, the court might view the case differently."). On appeal, Mr. Hawkins rebuts this conclusion by attempting to fault the court's "minimiz[ation] [of] the two and a half years from 2007 to 2010 when [he] did no driving at all." Aplt. Opening Br. at 33. We reject this argument not only based on our view that the district court thoroughly considered that time period, but also because it did so while adhering to our precedent.

More specifically, the district court's assessment of time finds support in our *Hennagir* decision. At issue in *Hennagir* was whether completion of a correctional institution's Peace Officer Standards and Training ("POST") program was an essential function for facility medical positions. *See* 587 F.3d at 1262. The plaintiff insisted that POST certification was non-essential because in *eight*

*years* of corrections medical work, she had *never* relied upon the program's

teachings.  *See id.* at 1263.  While we recognized that the plaintiff's lack of

utilization of the program went "to a number of *properly weighed* factors

[including] the amount of time spent on the job performing the function," *id.*

(emphasis added), we gave considerable weight to another counterbalancing

factor—"the consequences of not requiring an employee to perform the function,"

*id.*  Indeed, we considered it paramount in *Hennagir* that the plaintiff had "daily

exposure" to inmates and the consequences of failing to adhere to the POST

training in dealing with inmate attacks were "severe."  *Id.* (internal quotation

marks omitted).  We carefully considered scenarios (both hypothetical and real)

advanced by the employer in support of this factor and concluded that "common

sense" made the requirement of proper training "reasonable."  *Id.*

    We reach the same conclusion here.  Regardless of the two-and-a-half years

in which Mr. Hawkins did not have to drive a truck, the daily exposure to

company vehicles and product shipments created a strong, constant potential that

he might need to possess certification to drive a DOT-regulated truck.  As the

district court explicitly noted, "DOT hours of service rules," re-stocking

difficulties SHS sometimes encountered, various mechanics' truck-driving

policies, and the "need to find someone else who could fill in at the last minute,"

given the "small number of employees" at the Alva depot, all increased the

likelihood that he might have to drive a truck.  Aplt. App. at 1059–61.  And,

although the court also considered Mr. Hawkins's evidence that another employee could drive route trucks, it was entitled to be critical of the fact that Mr. Hawkins "offer[ed] no evidence that the extra person was on site and available to drive when needed." *Id.* at 1060 n.9 (italics omitted); *see Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ("While we must resolve doubts in favor of the parties opposing summary judgment, plaintiffs' conclusory allegations are insufficient to defeat [an] adequately supported motion."). Given the court's determination that "[Mr. Hawkins's] job was to keep the trucks loaded and on the road," Aplt. App. at 1060, there was nothing erroneous about its associated ruling that eliminating the truck-certification requirement might disrupt SHS's business.

Finally, though Mr. Hawkins argues that SHS "presented no proof" of two additional factors—the work experiences of past incumbents and of persons in similar jobs—he does so only with reference to his *personal* view that "in some depots the facility manager has to drive and in others he or she did not." Aplt. Opening Br. at 35–36 (internal quotation marks omitted). He has not meaningfully disputed the evidence that every facility supervisor was required to be DOT-certified, and he has clearly conceded that some SHS depots required facility supervisors to drive. *See id.* at 36. We therefore reject this conclusory assertion for what it is: another misguided attempt to unload his burden of persuasion onto SHS, despite our insistence in *White* that he shoulders this burden at all times. *See* 45 F.3d at 361.

In sum, reviewing the district court's assessment of the EEOC factors, we have no trouble accepting its ultimate conclusion regarding DOT certification. The district court carefully and properly reached a *legal* determination based on the evidence presented.  It observed numerous undisputed facts, notably: (1) that Mr. Hawkins "did drive [SHS] trucks regularly for a period of time in 2007"; (2) that "all [SHS] facility supervisors were required to be DOT qualified"; (3) that SHS's written description for the facility-supervisor job *required* DOT certification; (4) that, aside from route salespersons, only one other Alva-based employee besides Mr. Hawkins was authorized to drive a company truck; and (5) that failing to require DOT certification could seriously disrupt SHS's business. Aplt. App. at 1061.  The district court explicitly relied upon these undisputed facts—most of which were adduced by SHS—to find that, as a matter of law, DOT certification was an essential function of the facility-supervisor position.  In this way, the district court's analysis was patently consistent with our settled precedent.

Finally, we note that, to the extent that the court's calculus involved a tacit shifting of *some* burden onto Mr. Hawkins, we find such an allocation unremarkable.  That is, given the employee's responsibility to *persuade* the factfinder that he is *qualified* to perform the essential functions of a position, it is not surprising that a court would reason that the employee bears that same burden regarding the subsidiary question of what those essential functions actually are.

33

**3**

We now address Mr. Hawkins's view that several of our sister circuits "have directly addressed this issue and agree" that, in cases such as his, the *employer* bears the burden of persuasion concerning whether a job function is essential because of the employer's "superior knowledge as to the relevant factors." Aplt. Opening Br. at 20. In doing so, we recognize Mr. Hawkins's efforts to identify at least *some* extra-circuit caselaw to support his gloss on the allocation of the burden. But the decisions to which he briefly alludes do not serve him well for at least two reasons. First, these authorities arguably do not speak to the issue Mr. Hawkins raises—*viz.*, whether the employer must *persuade*, rather than simply *produce* evidence pertaining to the essential functions of a position. They are more fairly read to reinforce our own treatment of the issue, especially our insistence that the burden of persuasion at all times falls to the plaintiff. Moreover, even assuming *arguendo* that the cases were more germane to Mr. Hawkins's circumstances, we would nonetheless afford them little persuasive weight because the scope of their applicability is far more limited than Mr. Hawkins suggests. Nonetheless, it bears repeating that we are bound to follow our own precedent and its express incorporation of the EEOC regulations.

We find it clear as an initial matter that many of Mr. Hawkins's authorities do not specifically implicate his misallocated-burden argument. In fact, they bolster the distinction we articulated above: that while both parties face a burden

of production, the plaintiff always bears the ultimate burden of persuasion.  *See,*
*e.g.*, *Bates*, 511 F.3d at 991 ("[W]e agree with the Eighth Circuit's approach that
an employer who disputes the plaintiff's claim that he can perform the essential
functions must *put forth evidence* establishing those functions." (emphasis added)
(internal quotation marks omitted)); *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d
561, 569 (8th Cir. 2007) ("[O]nce the plaintiff makes a facial showing that
reasonable accommodation is possible, the burden of *production* shifts to the
employer to show that it is unable to accommodate the employee.  If the employer
demonstrates that the plaintiff is unable to perform the essential functions of the
job even with reasonable accommodation, *the plaintiff must then rebut that*
*showing with evidence* of his individual capabilities.  Thus, the plaintiff's burden
merges with *his ultimate burden of persuading* the trier of fact that he has
suffered unlawful discrimination." (alteration in original) (emphases added)
(citations omitted) (internal quotation marks omitted)); *Monette v. Elec. Data Sys.*
*Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996) (explaining that, although the employer
must produce some evidence that a challenged job requirement is job-related, "the
disabled individual retains the burden of proving that he or she is qualified to
perform the essential functions of the job"), *abrogated on other grounds by Lewis*
*v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *Benson*, 62 F.3d at
1112 ("The employee *at all times retains the burden of persuading* the trier of
fact that he has been the victim of illegal discrimination due to his disability."

35

(emphasis added)).

Mr. Hawkins also clearly misapprehends the import of some of his chosen authorities. Notably, he is mistaken that the First Circuit "also places the burden of proof on the employer and . . . has cited [our] holding in *White* . . . as supporting that conclusion." Aplt. Opening Br. at 18 (citation omitted). He is correct only with regard to the fact that in *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29 (1st Cir. 2000), the First Circuit relied upon *White* for the proposition that an employer is required to marshal *some* essential-function evidence. *See Ward*, 209 F.3d at 35. In the end, the *Ward* court spoke not to the employer's deficient *persuasive* powers, but to the employer's failure to adduce *any* evidence that the function at issue (job attendance) was essential. *See id.* ("What is noticeably absent from the record is *any* evidence that the nature of [the plaintiff's] position requires that he be present during specific hours of the day." (emphasis added)). The employer's failure to augment the record in some appreciable manner prompted the court to find a genuine disputed issue of material fact precluding summary judgment for the employer. Likewise, in its subsequent reasonable-accommodation assessment, the court observed that the employer "need[ed] to produce at least some modicum of evidence" to support its position. *Id.* at 37. We consequently find it patent that this case is not the

panacea Mr. Hawkins imagines it to be.[10]

Ultimately, even if we suspected that Mr. Hawkins's proffered authorities were somewhat persuasive in our efforts to resolve his appeal—which we do not—we would not supplant our own principled decisional pathway with those of our sister circuits. We reprise our view that the district court meticulously and faithfully followed the roadmap dictated by Tenth Circuit precedent. Pursuant to that well-settled approach, it consulted the factors specified by the EEOC regulations—under which the employer is obliged to come forward with a modicum of evidence. Guided by that regulatory framework, the court examined the evidence and made a legal determination. Insofar as our caselaw tacitly alludes to some burden-shifting, at no point does it relieve Mr. Hawkins of the burden of persuading the court that he could perform the essential functions of the facility-supervisor position, with or without accommodation. We consequently reject Mr. Hawkins's main argument for reversal and conclude that the district court correctly handled the relevant legal burdens in this case.

---

[10]     The same is true of *Stone v. City of Mount Vernon*, 118 F.3d 92 (2d Cir. 1997), to which Mr. Hawkins implicitly refers by including it in a block quotation: specifically, the employer completely failed to come forward with any evidence regarding the challenged functions. *See* 118 F.3d at 99–100 ("While plainly the employer's judgment as to which functions are essential is highly relevant[,] . . . we have seen in the record *no* evidence [of the employer's contentions]. Plainly, therefore, it cannot be said that the reason the FAB and FPB positions exist is to perform the fire-suppression function." (emphasis added) (citation omitted) (internal quotation marks omitted)).

37

**B**

Mr. Hawkins also argues that the district court impermissibly conflated critical concepts in its calculus.  In his view, when the court found that driving a company truck was an essential function of the facility-supervisor position, it confused job *qualifications* with essential *functions—viz.*, it "failed to recognize that uniform performance of the function is the standard—not uniform enforcement of the qualification."  Aplt. Opening Br. at 22 (emphasis omitted). Though we do not gainsay that "qualifications" and "functions" are in some sense distinguishable terms, we find thoroughly unpersuasive Mr. Hawkins's contentions that the district court muddled the two in reaching its decision. Rather, we are satisfied that the court properly assessed whether the ability to drive a DOT-regulated truck was an essential function of the facility-supervisor role—and that it did so in accordance with well-settled circuit precedent.

SHS's position of mandating DOT certification for facility supervisors is unremarkable; that is, it "was not insisting upon a job qualification merely of its own devising."  *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999).  Its requirement stems directly from the federal motor-safety regulations, which preclude a person from "driv[ing] a commercial motor vehicle unless he/she is qualified to drive," 49 C.F.R. § 391.11(a), by, *inter alia*, being "medically certified as physically qualified to do so," *id.* § 391.41(a)(1)(i).  "The validity of these regulations is unchallenged, they have the force of law, and they contain no

qualifying language about individualized determinations." *Albertson's*, 527 U.S. at 570. Thus, as a matter of law, if an essential function of a position is the ability to operate a commercial vehicle, then being DOT-certified is an automatic, binding, and utterly unavoidable requirement. *See id.* (finding an employer that terminated a commercial driver had an "unconditional obligation" and "consequent right" to follow DOT regulations addressing certain physical qualifications). Accordingly, the district court here did not err in its focus on the ability to operate a commercial truck.

More broadly, we consider it well-settled that, as long as its specifications are "job-related, uniformly-enforced, and consistent with business necessity, the employer has the right to establish what a job is and what is required to perform it." *Tate*, 268 F.3d at 993; *accord Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1127 (10th Cir. 2008). We have approved a wide variety of such specifications, be they listed as skills, qualifications, or certifications. For example, in *Tate*, we approved an employer's choice to mandate DOT certification for "operat[ing] a commercial motor vehicle (CMV) hauling propane and other refined fuel products," 268 F.3d at 990, and found that the employee was not a *qualified* individual with a disability when his seizure disorder precluded certification, *see id.* at 995–96. Moreover, as noted above, in *Hennagir*, we found that the employer could permissibly require training and certification in the facility's safety protocol. *See* 587 F.3d at 1262–64. Indeed, in

39

*Picture People*, we concluded that verbal-communication skills were essential to the "performer position" in a photography studio.  *See* 684 F.3d at 986–87.

As applied here, SHS adduced evidence that it uniformly required facility supervisors to be able to operate its DOT-regulated route trucks—a skill that, by law, mandates DOT certification.  *See* Aplt. App. at 594.  This evidence satisfied the district court that the ability-to-drive requirement was job-related and tailored to SHS's business needs.  When the district court concluded that this was an essential function of the facility-supervisor position, it followed as a matter of law that DOT certification was necessary as well.  In any event, it is pellucid that SHS *can* require this certification of its facility supervisors.  *See* 29 C.F.R. § 1630.15(e) (providing that an employer may defend against an unlawful-discrimination claim by asserting that a "challenged action is required or necessitated by another Federal law or regulation").  We repeat our conclusion that the district court's principled analysis was correct, and we consequently reject as off-point and meritless Mr. Hawkins's conflated-analysis argument.

## C

Having set forth in detail the reasons why the district court properly heeded circuit precedent, we need not (and thus do not) reach the merits of whether estoppel theories should have precluded Mr. Hawkins from bringing his ADAAA claim.  We are satisfied to affirm the district court's grant of summary judgment in favor of SHS without addressing the alternative estoppel basis for its ruling.

## IV

For the reasons stated herein, we **AFFIRM** the district court's grant of summary judgment to SHS.